Loyola F. HARRINGTON

v.

Clinton S. HARRINGTON et al.

No. 79–85–Appeal.

Supreme Court of Rhode Island.

April 8, 1981.

John S. Brunero, Jr., West Warwick, for plaintiff.

Aram K. Berberian, Warwick, for defendants.

## OPINION

KELLEHER, Justice.

This is a Superior Court civil action in which Loyola Harrington (Loyola) seeks to set aside an assignment and a foreclosure of a real estate mortgage. The defendants are Loyola's husband Clinton (Clinton), John Koszela, Sr. (Koszela), and Westwood Estates, Inc. (Westwood). After a jury-waived trial, a justice of the Superior Court voided both the assignment and the foreclosure, and he also ruled that the original mortgage had been discharged. Koszela and Westwood have appealed.

In May 1948, Clinton became the owner of a parcel of real estate situated on Log Bridge Road in the town of Coventry. The next year he married Loyola, and the couple apparently took up residence in Clinton's

Log Bridge Road abode. Subsequently, on December 28, 1959, he conveyed the property to himself and Loyola as joint tenants. Later, in late June 1966, the Harringtons borrowed $4,000 from the Centreville Savings Bank (the bank) and secured this obligation by the execution of their promissory note and a mortgage. The Harringtons' payments were made promptly and punctiliously through January 1978. At that time the outstanding balance on the mortgage was $1,545.68.

On January 16, 1978, the attorney now representing Koszela and Westwood [1] sent a letter to the bank, the body of which letter reads as follows:

"Clinton S. Harrington, one of your mortgagors, hereby requests and directs that you transfer the mortgage made by him to you to John Koszela, Sr., Pole 96, Victory Highway, Greene, Rhode Island, 02827, pursuant to the provisions of G.L. 1956, 34–26–4. Enclosed herewith please find Coventry Credit Union treasurers check number 009725 in the amount of $1,593.00, which I believe should cover the indebtedness secured by the mortgage. Please do not discharge the mortgage."

The bank complied with Clinton's request and, after cashing the check, assigned the mortgage to Koszela. The assignment was dated February 17, 1978. At no time was Loyola ever aware that her mortgage had been paid off or that Koszela was now the mortgagee. Apparently, when the next mortgage installment was not paid, Koszela wasted no time—within a month and a half he exercised the power of sale contained in the mortgage and sold the property at auction to Westwood for $1,594.

At this point, we should delineate the relationship between Clinton, Koszela, and Westwood. Clinton is Koszela's long-time employee and friend. Koszela, because of his status as the majority stockholder and president of the corporation, is, for all practical purposes, Westwood.

In the spring of 1978 Loyola began to wonder whatever happened to the monthly mortgage-payment notices the bank used to send to the Harringtons. When she contacted the bank, she was told about the assignment and the mortgage foreclosure. At this point, Loyola thought it best to contact an attorney.

On or about April 26, 1978, an envelope addressed to Clinton arrived at the Harrington home. When Loyola opened the envelope,[2] she found three "papers." The papers included an unsigned mortgage deed from Westwood to Clinton on the disputed property. The mortgage purported to secure a loan of $40,000 to Westwood from Clinton. The other documents consisted of an unsigned power-of-attorney form that would permit Clinton to sell, lease, or otherwise control the parcel and a letter signed by attorney Aram K. Berberian instructing Clinton first to have the deed and power of attorney signed by a duly authorized corporate officer and then to record the deed.

In finding for Loyola, the trial justice reasoned that a mortgage could not be assigned pursuant to G.L.1956 (1969 Reenactment) § 34–26–4 unless both mortgagors, acting concurrently, request such an assignment. The trial justice also held that "[t]he ends of justice * * * require that the Centreville Savings Bank discharge the original mortgage."

■ The first issue with which we shall concern ourselves is the assignment of the bank's mortgage to Koszela. The assignment here is governed by § 34–26–4, which provides in pertinent part:

"Requiring assignment of mortgage in lieu of discharge—Enforcement by incumbrances.—Where a mortgagor is entitled to redeem, he shall by virtue of this section have power to require the mortgagee, instead of discharging or reconveying, and on the terms on which he would be bound to discharge or reconvey,

1. Clinton entered an appearance in his own behalf and denied all the allegations of the complaint but failed to appear at the hearing.

2. At the hearing, Loyola explained that it was common practice in the Harrington household for her to open all the incoming mail.

to assign the mortgage debt and convey the mortgaged property to such third person as the mortgagor directs * * *."

The trial justice found as a fact that it was Clinton who had directed the bank to assign the mortgage to Koszela. In doing so, he pointed to the directive found in the January 16, 1978 letter. In voiding the assignment, the trial justice relied on the holding of *Green v. Walker*, 22 R.I. 14, 45 A. 742 (1900). In *Green*, one cotenant mortgagor attempted to obtain an assignment of the mortgage without the consent of the other cotenant mortgagor. That assignment was attempted pursuant to G.L.1896, ch. 207, § 7, which is identical to that portion of § 34–26–4 cited above. The court in *Green* held that although the two mortgagors, acting together, might obtain the assignment, neither could do so alone. The most that one could expect of the mortgagee on receiving payment was either a release or a discharge of the mortgage; or upon payment in full, one could be entitled to be subrogated to the rights of the mortgagee as far as might be necessary to obtain a contribution from the other cotenants to the extent that the payor has paid their share. The law cited over half a century ago in *Green* applies with equal force to the assignment obtained by Clinton. The assignment is, in light of the statute, a nullity.

Koszela and Westwood argue that the trial justice committed error in ordering the bank to discharge the mortgage. They contend that Koszela, at least, is entitled to be subrogated to the bank's interest in the mortgage; and in making this claim, they imply that Koszela, rather than Clinton, made the final payment to the bank. We cannot agree with this contention.

Neither Koszela nor Westwood has a claim to legal subrogation[3] because neither was a surety on the mortgage or had any interest in the Harrington property at the time the mortgage was paid in full. Osborne, *Mortgages*, §§ 278, 280 at 563, 566–67 (2d ed. 1970). They have no basis for any claim of conventional subrogation because neither has established that he or it made the payment to the bank. Osborne, *Mortgages*, § 280 at 567. In fact, the machinations presented by this record border on the bizarre as one wonders what motivated defendants to do what they did. The only person to testify was Loyola, and whatever other evidence was presented to the trial justice was supplied by stipulations agreed to by both Loyola and defendants' attorney, Mr. Berberian.

The final issue of this appeal concerns the admission into evidence of the documents found in the letter addressed to Clinton but opened by Loyola. Koszela and Westwood argue that the use of this letter was erroneous because of a lack of proper authentication. We cannot agree.

Although it is true that a signed writing may not be introduced unless it is authenticated, in *Brimbau v. Ausdale Equipment Rental Corp.*, R.I., 376 A.2d 1058 (1977), we pointed out that the authentication need not necessarily be by way of direct testimony about the authenticity of a signature, but proof of any circumstance that will support a finding that the writing is genuine will suffice to authenticate the document. At trial, all the litigants acknowledged the authenticity of the document relating to the March 31, 1978 foreclosure sale. This document contains two signatures of Mr. Berberian. The pleadings contain two other Berberian signatures. When compared with the signature appearing on the letter to Clinton, the similarities are such that there is no question that the letter containing the blank mortgage and

---

3. In *Hospital Service Corp. of Rhode Island v. Pennsylvania Insurance Co.*, 101 R.I. 708, 712, 227 A.2d 105, 109 (1967), we noted that whereas "legal subrogation" is said to have its source in equity and arises by operation of law, "conventional subrogation" is regarded as resulting from an agreement entered into between the parties. Professor Osborne informs us that this dichotomy has been the subject of criticism; in his opinion in all cases subrogation arises by "operation of law," and the presence of a contract or agreement is but another equitable factor to be considered by the trial justice as he or she determines whether subrogation will be allowed. Osborne, *Mortgages*, § 277 at 563 (2d ed. 1970).

power of attorney came from Mr. Berberian. In these circumstances, we see no error by the trial justice in allowing the letter into evidence.

The defendants' appeal is denied and dismissed, and the judgment appealed from is affirmed.

SHEA, J., did not participate.